Johny HOLLOWAY, Plaintiff,

v.

DOUG FISHER, INC., Business Service Systems, Inc., Beverly A Fisher, Douglas M. Fisher, and The Catalyst Group, Inc., jointly and severally, Defendants.

Civ. A. No. 92–CV–40300–FL.

United States District Court,
E.D. Michigan,
Southern Division
at Flint.

Aug. 2, 1994.

---

Kendall B. Williams, Flint, MI, for plaintiff.

Steven F. Spender, Flint, MI, Frederick J. Cady, III, Saginaw, MI, Kathleen M. Main, Flint, MI, Joseph W. Murray, Detroit, MI, for defendants.

### MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Before the Court are two motions for partial summary judgment filed by the various defendants, plaintiff's response, and supplemental memorandums filed by all parties as required by the Court (*see* Order of June 23, 1993, D.E. # 44). Defendants Doug Fisher, Inc. ("DFI"), Business Service Systems, Inc. ("BSSI"), Douglas M. Fisher, and Beverly A. Fisher filed a motion for partial summary judgment on counts I, II, V, VI, and VII of plaintiff's amended complaint (D.E.# 37).[1] Defendant Catalyst Group, Inc. ("Catalyst") filed a motion for partial summary judgment on counts IX and X (D.E. # 38).[2] After receiving defendants' motions and plaintiff's response thereto, the Court ordered the parties to supplement the record on the issue of ERISA[3] preemption. For the reasons stated herein, plaintiff's claims against defendant Catalyst are found to be preempted by ERISA. Thus, defendant Catalyst's motion (D.E. # 38) is GRANTED and plaintiff's state law claims are dismissed.[4] Nevertheless, the Court hereby GRANTS plaintiff leave to amend his complaint to restate his claims against defendant Catalyst under ERISA. The motion filed by defendants DFI, BSSI, Doug Fisher, and Beverly Fisher (D.E. # 37) is GRANTED IN PART and DENIED IN PART, as specified herein.

### I.  Facts

#### A.  Standard of Review

For purposes of these summary judgment motions, defendants, as movants, must estab-

---

1. Count I alleges fraud against defendants Doug Fisher and DFI. Count II alleges fraud against defendants Beverly Fisher and BSSI. Counts V and VI allege conversion against defendants Doug Fisher and DFI (count V), and Beverly Fisher and BSSI (count VI). Count VII alleges intentional infliction of emotional distress against all four of the above-named defendants.

2. Counts IX and X are brought by plaintiff against defendant Catalyst only, alleging fraud (count IX) and breach of contract (count X).

3. The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

4. Although defendant Catalyst sought summary judgment only as to counts IX and X, count VIII, alleging negligence against Catalyst, also is preempted by ERISA and must be dismissed.

lish that there is no dispute as to material fact and that they are entitled to judgment as a matter of law. In its analysis, the Court must accept as true all uncontroverted facts asserted by plaintiff, the non-moving party, and must resolve all factual inferences in plaintiff's favor. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989) (discussing summary judgment standard after these three Supreme Court decisions).

### B. Background

This action arises out of an injury received by plaintiff, Johny Holloway, while on a fishing trip to Arkansas in June 1990. After having the hook of a fishing lure stuck in his eye, plaintiff required extensive medical treatment, ultimately resulting in removal of the eye. Plaintiff incurred over $16,000.00 in medical expenses, which he believed would be covered by medical insurance procured and maintained by his employer. To his surprise, plaintiff's medical claims were rejected by his former insurer, Blue Care Network, and plaintiff discovered that, in fact, he had no medical insurance coverage at all. As a result, plaintiff brought this action against his former employer, his employer at the time of the injury, and his employer's principals.

Plaintiff began working for DFI in August 1987 as a truck driver delivering school books. As school book delivery is a seasonal business, coinciding with the school year, plaintiff was paid a salary without benefits and was laid off for a period of time each summer. Until February 1989, plaintiff worked solely for DFI and received no health benefits whatsoever.

In February or March 1989, DFI contracted with defendant Catalyst, an employee leasing agency, to become the employer of all of DFI's workers. Pursuant to this arrangement, all DFI employees were terminated by DFI and immediately hired by Catalyst. These employees were then leased back to perform work at DFI. In exchange for a service fee, Catalyst administered payroll for its new employees and established a health benefits plan. Health insurance was offered to all employees on a shared-cost basis, with DFI paying $56.00 towards each month's premium and the remainder being paid by the individual employee through payroll deduction. According to plaintiff, all other operational functions at DFI remained within the control of Doug Fisher, as principal and sole owner of DFI. Doug Fisher was responsible for recommending hiring and firing of employees, and setting pay scales, benefits, and bonuses, which recommendations were always accepted by Catalyst. DFI allegedly controlled all training, hourly schedules, and overall supervision of all Catalyst employees working at DFI.

In March 1990, Doug Fisher arranged for the termination of all DFI workers from Catalyst and their rehire by BSSI, an employee leasing agency recently formed by Doug Fisher's wife Beverly. As with Catalyst, BSSI's involvement consisted of payroll and benefits administration for DFI's workers, all other aspects of employee relations and supervision being directed by Doug Fisher and DFI. At the time of this second change in employers, Doug Fisher met with the affected employees to explain the change, indicating that either health insurance coverage would remain the same or equivalent coverage would be provided by DFI and BSSI. Apparently, Doug Fisher did not mention anything about COBRA[5] continuation coverage at this meeting.

In early April 1990, following termination of the DFI workers' employment with Catalyst, Lynn Revoldt, the benefits administrator at Catalyst, mailed to most of the former Catalyst employees a notification of their rights to continuation coverage of their health benefits under COBRA.[6] There is no record, however, that such a COBRA notification letter was sent to plaintiff from Cata-

---

5. Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161–1168.

6. *See* 29 U.S.C. § 1166 (notice requirements).

lyst in April 1990, and plaintiff claims that he did not receive the letter at that time. According to defendants, DFI workers receiving COBRA letters promptly turned the letters over to BSSI and their premium payments were made by BSSI.

In the second or third week of April, Beverly Fisher contacted Ms. Revoldt to determine the amount of premium payments due for each of her new employees under the COBRA continuation coverage. According to Ms. Revoldt, she was instructed to work directly with Doug and Beverly Fisher regarding which employees would be receiving COBRA benefits, and was not to make personal contact with any of the DFI workers who were now employed by BSSI. While reviewing the DFI workers' files, Ms. Revoldt discovered that a COBRA letter had not been sent to plaintiff in early April, and so such a letter was generated on May 1, 1990, and mailed to him on May 10, 1990. Apparently, the letter sent to plaintiff not only contained an erroneous premium amount due, but also misstated the date by which time plaintiff was required to elect continuation coverage under COBRA.[7]

For most of its DFI employees, BSSI decided to continue health insurance benefits under the Catalyst group plan through COBRA until BSSI could procure an alternative and more permanent health insurance option. BSSI did this by making the COBRA premium payments to Catalyst for each employee who elected to continue coverage under the statute. In addition to BSSI deducting the premium payments from the DFI workers' paychecks,[8] DFI also contributed the same $56.00 per month as it did when its workers were employed by Catalyst.

In May 1990, Ms. Revoldt again spoke with Beverly Fisher in order to confirm which BSSI employees were covered by BSSI's COBRA premium payments to Catalyst and the amounts paid for each employee. Allegedly, at that time Beverly Fisher informed Ms. Revoldt that BSSI would not pay plaintiff's COBRA premiums as they were too expensive.[9] As instructed by Beverly Fisher, Ms. Revoldt terminated plaintiff's coverage by Blue Care Network effective April 1, 1990.[10]

In June 1990, upon receipt of a second COBRA premium payment from BSSI, Ms. Revoldt called Beverly Fisher to confirm the BSSI employees covered by that payment. In response to questioning by Ms. Revoldt, Beverly Fisher indicated that plaintiff was not included in the premium payment but that his situation was taken care of by DFI and BSSI. Finally, in the fourth week of June 1990, Doug Fisher informed Ms. Revoldt that no further COBRA payments would be made by DFI or BSSI because as of July 1, 1990 replacement coverage had been obtained through Blue Cross/Blue Shield.

One significant fact in dispute between plaintiff and the DFI/BSSI/Doug Fisher/Beverly Fisher defendants is whether payment of plaintiff's COBRA premium by these defendants was conditioned upon plaintiff first presenting a COBRA notification letter to DFI or BSSI. While defendants state in their motion that "[e]ach employee was responsible for obtaining from Catalyst a COBRA eligibility letter setting forth the amount due for the COBRA premium" and that "BSSI would pay the premium upon presentation of the COBRA letter,"[11] plaintiff contends that such a requirement did not,

---

7. This letter forms the basis of plaintiff's allegations against defendant Catalyst.

8. According to defendants, all BSSI employees, including plaintiff, authorized the payroll deduction to be applied toward their health insurance premiums.

9. Defendants state that Ms. Revoldt gave Beverly Fisher a figure higher than what had previously been deducted from plaintiff's paycheck for health insurance.

10. Defendants allege that plaintiff's COBRA premium was not paid by BSSI because BSSI never received the required COBRA letter and plaintiff's health insurance coverage lapsed, effective April 1, 1990, due to non-payment of premiums. Further, defendants allege that neither Doug nor Beverly Fisher were aware that plaintiff's insurance coverage had lapsed until after plaintiff's accident on June 27, 1990 (defendants' motion at 6).

11. Defendants' motion for partial summary judgment at 4.

in fact, exist.[12] As apparently was done with another DFI worker, plaintiff argues that BSSI could have made the premium payment to Catalyst without attaching a COBRA letter at that time.

The parties also disagree as to what communications were exchanged between plaintiff and DFI regarding securing COBRA continuation coverage. Defendants assert that Doug Fisher's secretary told plaintiff on two occasions that BSSI needed the COBRA letter before it could pay the premium for plaintiff's health insurance.[13] Plaintiff, however, testified that after receiving a note one April morning at work requesting a "letter from Catalyst," he had his wife call DFI while he was at work driving his truck. Allegedly, plaintiff's wife informed Doug Fisher's secretary, Debra Wood, that no COBRA letter had been received, and Ms. Wood responded that DFI would take care of it.[14] Neither Doug nor Beverly Fisher ever spoke to plaintiff directly about his COBRA letter.[15]

Plaintiff alleges that upon receiving his COBRA letter from Catalyst in mid May, he took it to DFI and spoke to Doug Fisher who assured him that his health insurance was taken care of.[16] Defendants, however, contend that plaintiff never spoke with Doug Fisher about COBRA and that neither Doug nor Beverly Fisher ever saw plaintiff's COBRA letter until after the filing of this lawsuit.[17] Defendants argue that, contrary to plaintiff's testimony, plaintiff could not have discussed the letter with Doug Fisher on his next day at work because he was laid off on May 17, 1990, two days before he received the letter from Catalyst.[18]

Although BSSI deducted over $550.00 from plaintiff's paychecks from April to June 1990, BSSI did not in fact make any COBRA premium payments to Catalyst on plaintiff's behalf, nor did BSSI put that money toward procuring an alternative source of health insurance coverage. Defendant BSSI contends, however, that the deductions were made in anticipation that plaintiff would present a COBRA letter and that the money would then be available to pay the premiums.[19] According to defendants, efforts to obtain or reinstate plaintiff's health insurance continued until some time after plaintiff's accident. When it became apparent that Blue Cross/Blue Care Network would not reinstate the insurance, all the money deducted from plaintiff's paychecks was immediately returned to plaintiff.[20]

### C. Joint Employer Status

In his response to defendants' motions, plaintiff has expressed the theory that at the times when he was on the payroll of Catalyst and on the payroll of BSSI, these entities merely served as nominal employers of the DFI workers.[21] Plaintiff asserts that under both state and federal common law the employment relationships that existed at those periods of time were two separate joint employer relationships, one joint employer being Catalyst/DFI and the other being BSSI/DFI. As this argument is not refuted by defendants in any reply brief, for the purposes of this motion the Court will accept plaintiff's argument as correct. Because plaintiff's joint employer theory is not before the Court as a motion to recognize this relationship as a matter of law (as part of a summary judgment motion brought by plaintiff), nor is it made an issue in defendants' motions, the question is not properly before the Court for adjudication at this time.

---

**12.** Plaintiff's response at 6. Plaintiff argues in support of this assertion that BSSI paid the COBRA premium for at least one employee, Dave Jordan, without submitting the COBRA letter with the payment to Catalyst.

**13.** Defendants' motion for partial summary judgment at 5.

**14.** Plaintiff's response at 6.

**15.** Plaintiff's response at 6–7.

**16.** Plaintiff's response at 7.

**17.** Defendants' motion for partial summary judgment at 5–6.

**18.** *Id.*

**19.** Defendants' motion for partial summary judgment at 5.

**20.** Defendants' motion for partial summary judgment at 9.

**21.** *See* plaintiff's response at 9–13.

## II. ERISA Preemption

### A. Legal Standard

■ In enacting ERISA, Congress included a preemption provision, expressly preempting "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The term "State law" is defined by the statute as including "all laws, decisions, rules, regulations, or other State action having the effect of law...." 29 U.S.C. § 1144(c)(1). Thus, the preemptive effect of ERISA applies to all state-law claims that "relate to" an employee benefit plan, whether derived from legislative enactment or state common law. *Van Camp v. AT & T Information Systems*, 963 F.2d 119, 122 (6th Cir. 1992).

■ The Supreme Court has interpreted this preemptive language broadly, indicating that the phrase "relate to" must be "given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Moreover, this preemption is not limited to "state laws specifically designed to affect employee benefit plans," *Shaw*, 463 U.S. at 98, 103 S.Ct. at 2900, but extends to all state laws that "affect such plans," *Ingersoll–Rand v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990), regardless of the directness of the effect, or whether the state law was intended to affect an ERISA benefit plan. *Id.*

Despite the sweeping effect of ERISA's preemption provision, the courts have recognized that the breadth of that preemption is not without its limits. *Van Camp*, 963 F.2d at 122, *citing Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. Indeed, "the Supreme Court has indicated that '[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.'" *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 553 (6th Cir.1987) (quoting *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21). In *Neusser*, the Court of Appeals recognized three factors which should be used to determine whether a state law's relation to an employee benefit plan falls within the "remote and peripheral" exception to § 1144 preemption. 810 F.2d at 555. These three factors include: (1) "whether the state law represents a traditional exercise of state authority," *id.;* (2) whether the state law "'affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—'" as opposed to merely affecting "'relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan,'" *id.* at 556 (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises*, 793 F.2d 1456, 1467 (5th Cir.1986)); and (3) the extent to which any possible effect of the state law on an ERISA plan is incidental, *Neusser*, 810 F.2d at 556. The court later added what is arguably a fourth factor: whether ERISA, or federal common law under ERISA, provides a remedy for the wrong alleged through state law claims. *Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272, 1283 (6th Cir.1991) (Judge Nathaniel R. Jones, dissenting) (citing *Perry v. P*I*E Nationwide, Inc.*, 872 F.2d 157, 161–62 (6th Cir.1989)).

### B. Defendant Catalyst

Under the facts alleged in the complaint, plaintiff asserts claims against defendant Catalyst for negligence, fraud, and breach of contract. All of these state law claims arise out of Catalyst's alleged malfeasance and nonfeasance regarding its duties required under COBRA, triggered by the termination of plaintiff's employment with Catalyst. In his supplemental brief, plaintiff does not dispute that his claims against Catalyst are preempted by ERISA's broad brush. In fact, plaintiff concedes that these claims are governed by federal law (plaintiff's supp. brief at 2).

Therefore, plaintiff's common law state claims against defendant Catalyst are preempted and are DISMISSED. As noted above, within fifteen days after the date of this order, plaintiff shall file an amended

complaint restating his claims against Catalyst under the COBRA amendments to ERISA.

### C. Defendants DFI, BSSI, Doug Fisher, and Beverly Fisher

■ In their supplemental brief, these defendants argue that plaintiff's claims against them also are preempted by ERISA's broad preemptive stroke. Plaintiff argues, however, that any relation to an ERISA plan is tenuous at best, and that these claims should not be preempted. For the reasons that follow, the Court agrees with plaintiff.

To determine whether plaintiff's claims against defendants DFI, BSSI, Doug Fisher, and Beverly Fisher are preempted by ERISA, the Court must apply the factors enunciated by the Sixth Circuit in *Neusser* and *Perry*. After consideration of these factors, the Court concludes that plaintiff's claims against these defendants are not preempted. First, the state law claims being asserted by plaintiff herein were developed under the common law of Michigan and are a traditional area of the law which falls under the authority of the several states, not the federal government. Second, while these defendants may be principal ERISA entities vis-a-vis their present employees, as plaintiff correctly notes there was no ERISA plan in existence at the time that his claims arose. Plaintiff does not make claim against these defendants for any benefits under any plan; rather, he claims that they are liable for failing to act in accordance with their representations made to plaintiff, giving rise to claims of fraud and breach of contract, for deducting money from plaintiff's paychecks without securing insurance for him, precipitating claims of unjust enrichment [22] and conversion, and for the resulting emotional injuries suffered by plaintiff as a result of the afore-mentioned conduct. The very essence of plaintiff's claims is that these defendants did not establish a health benefits plan or pay his premiums as they allegedly promised they would. Moreover, adjudication of plaintiff's claims will not require any consideration or interpretation of an ERISA welfare plan.

Third, any effect that plaintiff's claims have upon an ERISA plan will be incidental. True, the liability may affect these defendants, which may have some effect upon the funding of the employers' existing ERISA plan; nevertheless, to find preemption for that reason would preclude any finding of any liability under state law for any reason against an employer which also provides to its employees an ERISA welfare or pension plan. Certainly, the effect of these claims on any ERISA plan in this case is tenuous at best. Finally, neither ERISA nor the common law developed in application of that act provide a remedy for plaintiff under the facts of this case.

Plaintiff alleges that certain promises were made and acts undertaken by these defendants purportedly to ensure continuation of his coverage under some type of medical insurance. Despite these promises and acts, these defendants did not pay plaintiff's COBRA premiums for him; they did not procure another form of insurance; they did not include him in the health insurance plan that they finally settled on; and yet they did deduct money from his paychecks, an act upon which he allegedly relied in not procuring health insurance on his own accord. Merely because the premium payments were for COBRA continuation coverage does not automatically place the promise to pay them in this case under the preemptive umbrella of ERISA. Plaintiff's claims against DFI, BSSI, Doug Fisher, and Beverly Fisher are not preempted by ERISA.

### III. Defendants DFI, BSSI, Doug Fisher, and Beverly Fisher's Motion for Partial Summary Judgment

Because the Court has found that the claims brought against defendants DFI, BSSI, Doug Fisher, and Beverly Fisher (hereinafter: "Defendants") are not preempted by ERISA, the Court must address their motion for partial summary judgment. Defendants' move for summary judgment on

---

**22.** Count IV, which asserted a claim of unjust enrichment against these defendants, was voluntarily dismissed by plaintiff.

counts I, II, V, VI, and VII. The Court will address the motion with regard to each count *seriatim.*

### A. Count I—Fraud by defendants Doug Fisher and DFI

#### 1. Fraud

■ In count I, plaintiff alleges that Doug Fisher promised him, as an inducement toward employment with BSSI/DFI, that plaintiff would be provided with continuous, uninterrupted health insurance coverage similar to the insurance provided by Catalyst/DFI. Plaintiff claims that this statement was made fraudulently, and that Doug Fisher never disclosed to plaintiff that the money that was subsequently deducted from his paycheck by BSSI/DFI was not being used for the stated purpose of maintaining plaintiff's health insurance.

■ In Michigan, the elements of fraud or misrepresentation are well settled:

> "The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery."

*Hi–Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813 (1976) (quoting *Chandler v. Heigho,* 208 Mich. 115, 121, 175 N.W. 141 (1919)).

In their motion for partial summary judgment, Defendants argue that Doug Fisher did not make a fraudulent misrepresentation because the statement relied upon by plaintiff was a future promise and there is no evidence that the statement was made by Doug Fisher either with knowledge of its alleged falseness or with reckless disregard for its veracity. The statement in question was made by Doug Fisher at a meeting of DFI workers, in preparation of their termination from Catalyst and rehire by BSSI. In support of their argument, Defendants quote from plaintiff's deposition transcript, which indicates that plaintiff believes that Doug Fisher intended to provide insurance for his employees at the time he made the statement, and that what plaintiff considers to be recklessness is Doug Fisher's failure to keep his promise. While Defendants admit that plaintiff has stated a claim for breach of contract, they argue that the future promise made by Doug Fisher to provide health insurance is not actionable in fraud.

The Court finds that Doug Fisher's statement that the existing Catalyst-provided health insurance would be maintained if possible by BSSI, or, if not possible, that equivalent insurance would be procured, constituted not a present statement of fact as argued by plaintiff but rather a future promise to provide for plaintiff's health insurance needs. Because an action for fraudulent misrepresentation cannot be predicated upon a future promise, but only upon a statement relating to a past or an existing fact, plaintiff cannot base his fraud claim upon this statement. *Hi–Way Motor Co.,* 398 Mich. at 336, 247 N.W.2d 813.[23]

#### 2. Constructive Fraud

■ In plaintiff's response to Defendants' motion, plaintiff argues in the alternative that defendant Doug Fisher is liable for constructive fraud. Plaintiff argues that Doug Fisher was in a position of confidence with plaintiff and had a duty to disclose to plaintiff that the paycheck deductions being made by BSSI were not being applied toward his health insurance premiums. Plaintiff sets forth the elements of a claim of constructive fraud as follows:

(1) a showing of a relationship based on confidence;

---

**23.** This does not, however, preclude the possibility that Doug Fisher's statement provides the basis for a breach of contract claim.

(2) a showing of a representation or promise by a party to the relationship upon which the other party relies;

(3) a showing that the representation turned out not to be true, that confidence was abused, or the promise was not performed; and

(4) a showing that the party relying on the representation or promise was harmed as a result of the misrepresentation or breach of promise.

Plaintiff's response at 23. Even assuming that there is a cause of action in Michigan for constructive fraud, for two reasons plaintiff's claim against Doug Fisher must fail.

In support of his constructive fraud claim, plaintiff has neither put forth any evidence that Doug Fisher knew that the deductions made by BSSI were not being applied toward plaintiff's COBRA premiums, nor established that the employer/employee relationship between Doug Fisher and plaintiff constitutes a "confidential relationship" that gives rise to a duty to disclose. To adopt plaintiff's assumption that such a relationship exists would place the employer/employee relationship on par with other recognized confidential relationships such as exist between attorney and client or doctor and patient. Plaintiff fails to make an argument on this point, instead assuming that he has met the elements of this cause of action. Conspicuously, plaintiff has failed to provide any law in support of his conclusion that a confidential relationship existed between his employers and his self. Particularly for this reason, the Court finds that plaintiff has failed to state a claim of constructive fraud against any of the defendants to this action.

To the extent that Defendants seek summary judgment as to count I, the motion is GRANTED.

### B. Count II—Fraud by defendants Beverly Fisher and BSSI

■ In count II, plaintiff alleges that Beverly Fisher and BSSI made deductions from plaintiff's paychecks under the pretense that that money was to be applied toward payment of plaintiff's health insurance premiums. To the extent that DFI and BSSI were joint employers, this count also asserts a claim against DFI under the same facts. In their motion for summary judgment, Defendants do not address plaintiff's fraud claim with regard to the paycheck deductions made by BSSI/DFI. Moreover, unlike Doug Fisher's promise that health insurance would be provided, the act of deducting money from plaintiff's paychecks pursuant to plaintiff's consent to do so for the purpose of applying that money toward health insurance premiums could be interpreted as a representation of an existing fact—that plaintiff's health insurance was, indeed, being taken care of—upon which plaintiff can base a claim of fraud.

To the extent that Defendants' motion seeks summary judgment as to count II, the motion is DENIED.

### C. Counts V and VI—Conversion

■ In counts V and VI of his complaint, plaintiff asserts a claim of conversion against DFI, BSSI, Doug Fisher, and Beverly Fisher. Plaintiff alleges that BSSI/DFI deducted money from plaintiff's paychecks under the pretense that such sums would be applied toward plaintiff's health insurance premiums. Instead of providing plaintiff with insurance, however, the money remained deposited in a BSSI account. Defendants point out that upon plaintiff's return to Michigan in July 1990, and after Defendants became aware that they would not be able to reinstate plaintiff's insurance, the money deducted by BSSI/DFI was returned to plaintiff. Defendants argue that because plaintiff authorized the deductions from his paycheck, and because the money was returned when it became apparent that it could not be applied toward plaintiff's insurance, the facts do not support a claim for conversion.

Under Michigan law, a "[c]onversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales*, 360 Mich. 434, 438, 104 N.W.2d 360 (1960); *Rohe Scientific Corp v. National Bank of Detroit*, 133 Mich. App. 462, 468, 350 N.W.2d 280 (1984). The Supreme Court has held that "[a] conversion may be committed by (a) inten-

tionally dispossessing another of a chattel, * * * [or] (g) refusing to surrender a chattel on demand." [*Thoma*, 360 Mich. at 438, 104 N.W.2d 360.] Liability for conversion does not arise if the actor is privileged to dispossess another of the chattel. *Thoma, supra.* If defendant's right to possession was greater than that of plaintiff's, plaintiff could not maintain an action for conversion.

*Rohe*, 133 Mich.App. at 468, 350 N.W.2d 280.

Defendants argue for summary judgment on these counts, asserting that BSSI/DFI's dominion over the money was not wrongfully exerted, as plaintiff had consented to these deductions from his paychecks. Further, Defendants argue that there is no conversion where Defendants properly exerted dominion over the chattel and it was surrendered to plaintiff on demand. The Court finds Defendants' arguments to be specious, and concludes that summary judgment as to plaintiff's conversion claim against BSSI/DFI, as joint employers, would be inappropriate.

■ Although an action for conversion of money cannot be maintained unless there is an obligation on the part of the defendant to return the specific money entrusted to his care, *Garras v. Bekiares*, 315 Mich. 141, 148, 23 N.W.2d 239 (1946), the money need not be specifically earmarked for its return. *Citizens Ins. Co. of America v. Delcamp Truck Center, Inc.*, 178 Mich.App. 570, 575, 444 N.W.2d 210 (1989). Thus, despite the fact that the money deducted by Defendants was not expected to be returned to plaintiff, plaintiff would still have an action for conversion of that money entrusted to Defendants for a specific purpose yet wrongfully retained by Defendants after failure to utilize the money as intended. Should plaintiff prove at trial that BSSI/DFI intentionally deducted plaintiff's money under false pretenses (fraud), then plaintiff would have a cause of action for conversion. Moreover, even if deduction of the money was authorized, and Defendants intended to provide insurance originally, if at some point Defendants decided not to apply the money toward insurance premiums and yet continued to deduct money from plaintiff's paychecks, they may be liable for conversion for those further payroll deductions. The fact that the money was returned would limit Defendants' liability, but would not strip plaintiff of his claim for conversion. If the trier of fact finds that Defendants deducted money from plaintiff's paychecks without the intention of providing insurance, BSSI/DFI would be liable for an act of conversion; however, plaintiff's claim would be limited to the interest lost over the period of time Defendants may have wrongfully held the money.

To the extent that defendants' motion seeks summary judgment on plaintiff's conversion claim, the motion must be DENIED at this time. Nonetheless, as the only factual claim regarding conversion is based upon the payroll deductions by BSSI, Doug Fisher and DFI are only liable to the extent that they were a joint employer with Beverly Fisher and BSSI. Moreover, recovery under plaintiff's conversion claim would be limited to plaintiff's loss of use of the money during the time period in which Defendants wrongfully exercised dominion and control. Counts V and VI being duplicitous, the two counts are consolidated into count VI, and count V is DISMISSED.

### D. Count VII—Intentional Infliction of Emotional Distress

■ In count VII, plaintiff asserts a claim for intentional infliction of emotional distress. Plaintiff alleges that defendants deducted money from his paychecks, allowing him to believe he had health insurance. Although defendants knew that plaintiff had no insurance, they failed to disclose this to plaintiff. As a result, plaintiff was led to believe that he had health insurance, discovering the truth only after he was injured, and had incurred substantial medical expenses. Plaintiff claims that this conduct was extreme and outrageous in nature and was undertaken by defendants either intentionally or recklessly, causing plaintiff to suffer severe emotional distress.

Defendants move to dismiss count VII, arguing that Defendants' conduct was not extreme and outrageous, and that any emotional distress suffered by plaintiff was not severe. The Court agrees. Not only does Defendants' conduct fall short of being ex-

treme and outrageous, plaintiff also has failed to plead facts supporting his allegation that he suffered severe emotional distress.

In *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985), the Michigan Supreme Court, while falling short of recognizing a cause of action in Michigan for intentional infliction of emotional distress, discussed the elements of that tort as recognized by several other courts:

> "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

*Roberts*, 422 Mich. at 602, 374 N.W.2d 905 (quoting Restatement of Torts, 2d, § 46, p. 71). Thus, to establish a *prima facie* claim plaintiff must plead and prove four elements: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Id.*

While Defendants do not challenge the sufficiency of plaintiff's breach of contract claim, the facts which, if proven, appear to support such a claim do not establish the necessary tort element that Defendants' actions were extreme and outrageous. Defendants' alleged actions of deducting money from plaintiff's paychecks and subsequent failure to procure health insurance as promised do not rise to the level of conduct that would be extreme and outrageous. Clearly, such a failure to perform would be a breach of contract; nevertheless, though improper in their actions, Defendants' conduct was not "reckless" beyond any other conduct taken by a defendant in breach of a contract.

▪▪▪ The emotional distress suffered by plaintiff, of whatever degree, if recoverable at all, is an element of damages for Defendants' breach of contract, not a separate tort. Intentional infliction of emotional distress provides recovery for conduct that is extreme and outrageous, such as sending a dead mouse to someone through the mail. For a breach of contract, merely because the damages suffered cause great anguish or anxiety does not create a separate cause of action. Whether or not plaintiff can recover for this anguish or anxiety is dependent upon whether plaintiff's case provides an exception to the Michigan Supreme Court's ruling in *Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980) (recovery for mental distress not generally allowed for breach of insurance contract). Whether this is an exception, however unlikely, is a question not presently before the Court.

Furthermore, even if Defendants' actions could be considered extreme and outrageous, plaintiff fails in this case to establish that he suffered "severe emotional distress." The *Roberts* court further defined this fourth element of intentional infliction of emotional distress with reference to the Restatement of Torts, 2d:

> "The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.*"

422 Mich. at 608–09, 374 N.W.2d 905 (quoting Restatement of Torts, 2d, § 46, comment j, p. 77) (emphasis added in *Roberts* ). Plaintiff's proofs also fail to support this element of the claim.

Plaintiff argues that he suffered severe emotional distress in discovering to his dismay, while lying in the hospital about to lose his eye, that he was uninsured and owed thousands of dollars in medical bills. In support of his response, plaintiff quotes the following testimony from his deposition:

> Q  Would you characterize this conduct that you've referred to here as to be

utterly intolerable in a civilized community?

A Yes, I would.

Q Why?

A Because they took—promised me, took my money, never told me. I ended up injured with no insurance. That's intolerable in the civilized ...

Q In a civilized community.

A Community, right.

Q And by virtue of that, you have suffered emotional distress, although it was not severe?

A It wasn't severe enough I had to be hospitalized for it.

Q Well, how severe was it? What physical manifestations did you experience regarding your emotional distress, how did it affect you?

A Well, I felt like—when I found out I didn't have no insurance, I knew I had all those bills. Instead of losing my eye, *I said, why can't I just die to get out of this.*

Plaintiff's response at 16 (quoting J. Holloway dep. at vol. 1, p. 164, attached to plaintiff's response at exh. 4 (emphasis added by plaintiff)). In addition to this testimony, plaintiff cites to his deposition transcript at pages 158 and 160 which indicate that, upon questioning, plaintiff would not agree to delete the word "severe" from a certain paragraph of his amended complaint. Plaintiff's response at 15.

In their motion to dismiss, Defendants also cite to plaintiff's deposition transcript at pages 158 through 160. The transcript reads as follows:

Q I want to go on to page 18, this intentional infliction of emotional distress, and you've already testified to the emotional distress that you've incurred. Would you agree with me that the emotional distress that you've testified to so far could not be categorized as substantial or serious?

A Not serious.

Q You'd agree that it is not serious?

A Yes.

Q So, in paragraph 87, would you agree that we should take out "severe", and we'll just have that say, the conduct by Doug Fisher, D.F.I., Beverly Fisher, and B.S.S.I. was extreme and outrageous in nature. It was either intentionally or recklessly undertaken, and it caused emotional distress to plaintiff and his family; would you agree that would be more appropriate?

A Repeat that, again, please. What number are you on?

Q Paragraph 87.

A Okay.

Q Would you agree that that would read more appropriately toward the end of that sentence, it caused emotional distress to plaintiff and his family(.), since you already told me in your previous testimony it was not severe?

A No.

Q I didn't understand your answer.

A No, I wouldn't agree.

Q Well, you just told me it was not severe emotional distress. You've already answered that.

MR. CASEY: I don't think so. I think that's a mischaracterization of his previous testimony.

MS. O'CONNOR: He said not serious, but he wouldn't agree it was not substantial.

BY MR. SPENDER, continuing

Q Is it your position that it was severe?

A No, it wasn't severe.

Q Well, then, you would agree with me that in paragraph 87 that the emotional distress to you was not severe?

A No, and my family.

Q Your family is not a plaintiff in this lawsuit. I'm not concerned with your family. It may be severe to your family; however, they're not plaintiff's in this lawsuit. I'm only concerned with you because you're the plaintiff in this lawsuit.

Would you agree with me that it was not severe as it related to you? It may have been severe as it related to your

family, but as it relates to you, it was not severe, would you agree with me?

A  What's severe?

Q  I'm asking you if, in your opinion, it was severe, and I think you told me, no(.)?

A  Okay, no.

Q  No, it was not—that's my fault. It's not yours, but we start using double negatives, and I get confused.

Do you agree that the emotional distress that you sustained was not categorized as severe?

A  It wasn't severe enough until I had to go in the hospital or anything, no.

J. Holloway dep. at vol. 1, pp. 158–60.

At another point in his deposition, plaintiff also testified as to the source of his emotional distress:

Q  Emotional distress and mental anguish are G and H. What do you mean by that, what emotional distress and mental anguish have you experienced?

A  Well, the only emotional distress I'd be under would be, like, my medical bills.

Q  Not being able to pay them?

A  That's correct.

Q  Kind of like the embarrassment that you talked about earlier?

A  It's a stress. Any time you have bills that are outstanding, it's a stress.

Defendants' motion at 14 (quoting J. Holloway dep., pp. 129–30).

Additionally, the record indicates that plaintiff has never been hospitalized or received any treatment for emotional or mental distress arising from this incident. Moreover, there is no evidence of any prolonged manifestations of severe emotional distress, only plaintiff's statement that he felt as if he wanted to die.

The Court certainly sympathizes with plaintiff over his plight, and believes that plaintiff felt—and probably still feels—anger, resentment, grief, embarrassment, and an increased level of stress due to the traumatic injury he sustained and the cost of his medical treatment. Nevertheless, plaintiff has failed to set forth sufficient evidence that he suffered from severe emotional distress *to the extent that "no reasonable man could be expected to endure it."* From plaintiff's testimony, it is clear that he felt anxiety over the enormity of his medical bills. And while plaintiff may have resisted defense counsel's attempt to have him remove the term "severe" from his complaint, plaintiff also responded several times that he didn't feel that his emotional distress was severe. Irrespective of plaintiff's conclusions as to the seriousness or severity of his emotional distress at having incurred thousands of dollars in medical bills, the Court finds that the evidence of record cannot support a finding of emotional distress rising to the level of severity required by this cause of action.

For these reasons, plaintiff's claim must fail. Accordingly, Defendants' motion as to count VII is GRANTED, and count VII is DISMISSED.

## IV. Disposition

For the reasons stated herein, the Court finds that plaintiff's state law claims asserted against defendant Catalyst Group, Inc. are preempted by ERISA. Therefore, defendant Catalyst's motion for partial summary judgment (D.E. # 38) is GRANTED, and counts VIII, IX, and X of plaintiff's amended complaint are DISMISSED. Within fifteen days of the date hereof, plaintiff has leave to amend his complaint to restate his claims against defendant Catalyst under ERISA.

The motion for partial summary judgment filed by Doug Fisher, Inc., Business Service Systems, Inc., Douglas M. Fisher, and Beverly A. Fisher (D.E. # 37), is GRANTED IN PART and DENIED IN PART. Plaintiff's claims against these defendants are not preempted by ERISA. As noted herein, defendants' motion is DENIED as to counts II, V, and VI. The motion is GRANTED as to counts I and VII, and those counts are HEREBY DISMISSED. Furthermore, because counts V and VI are duplicitous, plaintiff's conversion claims are consolidated into count VI, and count V is DISMISSED.

## V. Final Pretrial Conference

A Final Pretrial Conference shall be held on September 27, 1994 at 1:30 p.m. At that

conference, all parties shall be represented by someone with authority to discuss and reach settlement of this action. A Joint Final Pretrial Statement shall be filed with the Court no less than five days prior to the conference.

SO ORDERED.